You have asked for our opinion on a series of questions concerning the application of the State law on physician self-referral. See Annotated Code of Maryland, Health Occupations Article, § 13-01 et seq. All of those questions relate to a scenario in which a patient is referred for a magnetic resonance imaging ("MRI") scan. You had previously posed the same scenario and questions to Assistant Attorney General Kathryn M. Rowe, who responded in a letter of advice dated January 4, 2006. A copy of that letter is attached to this opinion.
We have reviewed Ms. Rowe's letter and agree with her analysis and conclusions.[1]
Very truly yours,
J. Joseph Curran, Jr. Attorney General
Robert N. McDonald Chief Counsel Opinions and Advice

 THE ATTORNEY GENERAL OF MARYLAND OFFICE OF COUNSEL TO THE GENERAL ASSEMBLY January 4, 2006
The Honorable Paula C. HollingerMaryland Senate
You have asked a series of questions regarding the application of Maryland's law on physician self-referral. Your questions, and the answers thereto, appear below.
You present a specific factual scenario as a background for these questions. Under this scenario a patient of a physician in a group practice goes to the physician complaining of pain in his knee and is referred for an MRI that is performed by the group practice using a leased MRI machine. The physician was present on the premises during the MRI. He may or may not have read the MRI scan, but he ultimately makes a diagnosis based on the scan results.
1a. Would it violate the self-referral law for a physician in an orthopedic practice group to refer patients for tests on the machines owned by the practice?
Attorney General Curran addressed this precise question in 89 Opinions of the Attorney General 10 (2004) with respect to magnetic resonance imaging ("MRI") machines and computerized tomography ("CT") scanners. This opinion concluded that the self-referral law bars a physician in an orthopedic practice from referring patients for tests on an MRI machine or CT scanner owned by the practice, regardless of whether the services are performed by a radiologist employee or member of the group practice or by an independent radiology group. The opinion concluded that the referral could not fall within the exception for referral for in-office ancillary services where the definition of that term specifically excluded MRI and CT scan services. 89 Opinions of the Attorney General 10, 14 (2004). The opinion further concluded that the referral could not fall within the exception for referrals within the same group practice, as such a construction would "render meaningless the precise limitations that the Legislature created in § 1-302(d)(4), which encompasses certain referrals within a group practice, and thus would offend elementary principles of statutory construction." 89 Opinions of the Attorney General
10, 17, n. 8 (2004).
1b. Would the answer to question 1a be different if all of the scans were performed by or under the direct supervision of the referring practitioner?
This question raises the issue of whether referrals within a practice that cannot fit within either the § 1-302(d)(2) exception for referrals within a group practice or the § 1-302(d)(4) exception for referrals for in-office ancillary services, may nevertheless fall within the exception in § 1-302(d)(3). Health Occupations Article § 13-02(d)(3) provides that the limitations in the section do not apply to a "health care practitioner with a beneficial interest in a health care entity who refers a patient to that health care entity for health care services or tests, if the services or tests are personally performed by or under the direct supervision of the referring health care practitioner."
The origin of this particular exception is not completely clear. Unlike the exceptions for referrals within a group practice and referrals for in-office ancillary services, it does not come from the federal Stark law, 42 U.S.C. § 1395nn, which prohibits physician self-referral with respect to a specific list of services. Moreover, it did not appear in House Bill 1374 of 1992, which marked the first attempt to bar self-referral in Maryland. However, the legislative history for House Bill 1374 does contain a draft amendment submitted by a lobbyist that would have created an exception for "a health care practitioner who refers a patient to a health care provider for health care services where the practitioner or a health care practitioner in the same group practice, personally performs the health care service." The file also contains a note listing "Referrals by practitioners to entities in which the practitioner has a beneficial interest and in which the practitioner provides a personal service to the patient," as an "outstanding issue relating to House Bill 1374." I found nothing in the legislative history for either House Bill 1374 of 1992, or House Bill 1280 of 1993 which became the current referral law, that refer directly to this provision. However, the AMA Policy Statement on Self-Referral contained in the 1992 file states the general policy of the AMA as follows:
"(1) Physician investment in health care facilities can provide important benefits for patient care. However, when physicians refer patients to facilities in which they have an ownership interest, a potential conflict of interest exists. In general, physicians should not refer patients to a health care facility outside their office practice at which they do not directly provide care or services when they have an investment interest in the facility."
For the reasons that follow it is my view that § 1-302(d)(3) was intended to implement the portion of this policy that would allow referral "outside their office practice" when they do "directly provide care or services."
It is a well-established rule of statutory construction that a statute should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory. State v. Glass,386 Md. 401 (2005). Moreover, statutes are to be interpreted in accord with logic and common sense. Johnson v. Baltimore,387 Md. 1, 11 (2005). If the intention of Health Occupations § 1-302(d)(3) were to permit referral to an MRI or CT scanner, or any other service performed within the office or group practice of the referring practitioner, the careful definition of "group practice" in § 1-301(f), which limits the extent of the § 1-302(d)(2) exception for referrals within a group practice, and the "precise limitations" on the ability to refer for in-office ancillary services in § 1-302(d)(4) would be rendered meaningless. The specific language removing MRI machines and CT scanners from the scope of in-office ancillary services would have no effect so long as the physician directly supervised the provisions of the services.[2]
Rather than read the statute in such a way as to render § 13-02(d)(2) and (4) virtually meaningless, it is my view that § 13-02(d)(3) must be limited to instances where the referral is to an entity outside the practice of the referring practitioner. Support for this reading is found not only in the AMA Policy Statement discussed above, but also in the fact that the exception applies only where the practitioner has a beneficial interest in the health care entity, and not where there is a compensation arrangement.
1c. Is the HO § 1-302(d)(3) exemption inconsistent with the other provisions of the law that prohibit self-referrals?
If interpreted as discussed in the answer to Question 1b., it is my view that § 1-302(d)(3) is consistent with § 1-302(d)(2) and (4).
1d. Based upon the fact pattern provided above, if all of the readings were performed by or under the direct supervision of the referring practitioner, would the referral be permitted under § 13-02(d)(3)?
Under the fact pattern in your inquiry, the MRI machine is being leased by the group practice of which the referring practitioner is a member and the test is performed by the group practice. Under those facts, it is my view that the self-referral law would bar this referral even if the MRI is performed by or under the direct supervision of the referring practitioner.
2. Because MRI services, Radiation Therapy services, and Computer Tomography Scan services are specifically excluded from the definition of "in-office ancillary services" and not specifically excluded in the definition of health care services does this mean that those three services are included under health care service?
Health Occupations Article § 1-301(i) defines "health care service" as "medical procedures, tests and services provided to a patient by or through a health care entity." The definition contains no exceptions. It is my view that this definition clearly includes MRI, CT scans and radiation therapy services. Were this not the case, these three services would not be included in the § 1-302(b) prohibition on presenting a bill for "health care services provided as a result of a referral prohibited by this subtitle."
3. Does health care service refer to the ordinary medical activities performed by a physician in the course of treatment for the specific specialty? (i.e. setting a broken arm for an orthopedist; performing an EKG for a cardiologist, etc).
It is my view that the defined term "health care services" clearly includes ordinary medical activities performed by a physician in the course of treatment. However, I would not read it as limited to such activities.
Sincerely,
KATHRYN M. ROWE, Assistant Attorney General
[1] We are aware that the Circuit Court for Montgomery County granted a motion for summary judgment against a plaintiff alleging a violation of the self-referral law under a similar factual scenario in Duys v. Orthopaedic Associates, P.A., Case No. 253549-V (February 9, 2005). However, the circuit court did not issue an opinion explaining its reasoning and thus the judgment in that case presumably would be accorded even less precedential value than an unpublished decision of an appellate court. Cf. Maryland Rule 1-104.
[2] HO § 1-301(d) defines "direct supervision" to require that the health care practitioner be present on the premises where the health care services or tests are provided and available for consultation within the treatment area. I have also advised that to "supervise" the services or tests, the health care practitioner must be qualified to perform those services or tests. See Letter to the Honorable Peter A. Hammen dated December 9, 2005. *Page 55